UNITED STATES of America

v.

George E. CHAPDELAINE.

Cr. No. 85–040–S.

United States District Court,
D. Rhode Island.

Aug. 16, 1985.

James H. Leavey, Asst. U.S. Atty., Providence, R.I., for U.S.

Kirk Y. Griffin, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

SELYA, District Judge.

On May 14, 1985, between 8:30 and 9:00 p.m., George Chapdelaine, the defendant herein, was arrested at the Cloverleaf Motel in Lincoln, Rhode Island by members of the Lincoln police department, acting in concert with and under the aegis of the federal Drug Enforcement Administration (DEA). A subsequent search of the defendant's luggage and vehicle turned up sizable quantities of both cash ($6,000) and cocaine (approximately 3.5 pounds). In short order, Chapdelaine was bound over to a grand jury, indicted for possession of a Schedule II controlled substance with intent to distribute, *see* 21 U.S.C. § 841, and detained pending trial. He thereupon moved to suppress the introduction of the above-described evidence, along with certain inculpatory statements which he allegedly made while in custody at the Lincoln police station.

An evidentiary hearing was held on June 25–27, 1985. A briefing schedule was thereafter implemented. The court took the matter under advisement as of July 18, 1985. This rescript comprises the court's resolution of the questions presented.

### I.

Briefly summarized, the defendant argues that the physical evidence was obtained as a proximate result of (i) a warrantless arrest divorced of probable cause, and (ii) a warrantless search and seizure of his motor vehicle, which (a) was not incident to a lawful arrest, and (b) lacked probable cause. Chapdelaine further asseverates that his in-custody statements should be suppressed as they were obtained in violation of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), and in the wake of his requests for counsel. These claims will be treated seriatim.

#### A. *The Arrest*

Chapdelaine's arrest on May 14, 1985 capped a five-day DEA investigation head-

ed by Special Agent Frank DiCarlo. The DEA had received information from Lt. Tempest of the Woonsocket police department that a plan was afoot to transport five kilograms of cocaine from Florida to Rhode Island for distribution in the New England region. On May 9, DiCarlo interviewed one Pamela Harnois at the Lincoln police station. During several audiences with Harnois over the next few days, the following people were also present at different intervals: DEA Agents Moffett and McCarthy; Lt. Tempest; Lt. Wood of the Lincoln police department; Assistant United States Attorney Leavey; and Detective Roy of the Providence police (a special deputy United States Marshal).

In substance, Harnois told the officers that she had travelled to Florida with the defendant and her quondam boyfriend (Albert Gagnon) in mid-January, 1985; that the trip was made in an automobile rented from a Hertz agency in Rhode Island; and that, at Chapdelaine's request, she had held $50,000 in cash for him during that jaunt. While the group was in Miami, and from the vantage point of a motel room there, she observed the defendant apparently purchasing five kilograms of cocaine with the money she had carried. After the transaction was consummated, Harnois and Gagnon began the trip back to Rhode Island in the rental car (detouring en route to experience the elaborate fantasies of Disney World). They rejoined Chapdelaine near Kinston, North Carolina; he had relatives there and had previously dropped off a rattletrap bus which he planned to convert into a luxury mobile home. The trio left North Carolina ensemble, crossed the Mason-Dixon line, and returned to Rhode Island. Once there, they brought the cocaine to the Cloverleaf Motel, where Chapdelaine (who, according to Harnois, knew the owner) apparently stayed on a frequent, if intermittent, basis. At some point, Chapdelaine mentioned that Frank Kowal (affectionately known as "Babe") and Jimmy Lyons, both of whom resided in southeastern New England, were destined to become involved in the scheme. Harnois buttressed her tale by noting that she had

taken a series of snapshots during this journey. In addition, Harnois informed the officers that the defendant had told her that every time he went to Florida, he returned with cocaine. And, there was more.

She related that, predicated upon a discussion with Chapdelaine's son in early May, she believed that the defendant was in Florida at the moment. She thought that he was returning immediately (perhaps that very evening) to Rhode Island. She noted that he would be driving either a blue Volkswagen pickup truck with a "different-colored" door or a rented car. Finally, Harnois warned that the defendant kept company with an automatic weapon—probably an Uzi submachine gun—while engaged in narcotics trafficking; he had indicated to her that he would kill anyone who tried to interfere in his drug business because he did not want to go back to jail.

It must be emphasized at this juncture that this informant's revelations did not tumble aimlessly into a vacuum. All four of the names mentioned by Harnois were known to the police (three of them in a drug-related context). Chapdelaine's son had previously been arrested on drug charges; during that federal trial (several months earlier), Chapdelaine had advised Lt. Tempest that he would cooperate with the DEA regarding his knowledge of drug trafficking if the prosecution would recommend a sentence of less than jail for his offspring. Lyons had been arrested on cocaine charges by Massachusetts state police just a few weeks prior to the May 9 contact. Kowal had been arrested by Special Agent McCarthy in 1975 (in West Warwick, Rhode Island) while in possession of hundreds of thousands of vials of morphine; he was later convicted and sentenced to a lengthy prison term. Harnois also told Agent DiCarlo that Gagnon had set a fire to order in Warwick, Rhode Island in September 1984, and that he had to be treated for burns at a local hospital (Fogarty) as a result. Warwick detectives confirmed that a home had indeed been torched and hospital records showed that

Gagnon was hospitalized the day after the Warwick ustulation, suffering from first, second, and third degree burns.

With this information in hand, Agent Di-Carlo ordered a surveillance of the motel, and had Pamela Harnois call to see if the defendant was due to arrive that night (May 9). The owner of the hostelry confirmed that Chapdelaine often stayed at the Cloverleaf, but denied that he was expected that evening. On May 10, DiCarlo confirmed (through the DEA in North Carolina) that Chapdelaine was in the Kinston area, driving a blue VW pickup truck with an oddly-colored door and bearing Rhode Island license plates. (Harnois had voiced her belief that the defendant had a brother, Joseph, and a nephew, Allan, in Kinston; the pickup truck was spotted in North Carolina at the home of a Joseph Chapdelaine.) The Rhode Island plates bore the number 69582; a Registry of Motor Vehicles check showed that the plates had been issued to George Chapdelaine. On the same day, at DiCarlo's urging, Harnois placed calls to the homes of the two Chapdelaines listed in the Kinston telephone directory—William Allen and Joseph William. A woman at one of those numbers acknowledged that George was overseeing the finishing touches on the rehabilitation of his mobile home, but that he would be leaving soon.

On May 11, fearing detection in the sparsely settled environs of rural Kinston, the DEA terminated the North Carolina surveillance exercise. On May 14, Agent DiCarlo learned from Harnois that she had called North Carolina again and had been told that Chapdelaine had left early that morning for Rhode Island. DiCarlo arranged for intensified surveillance in the vicinity of the Cloverleaf Motel. Lincoln police officers were instructed to look for a blue VW pickup truck with Rhode Island registration 69582, and to arrest the defendant. At approximately 8:45 p.m., the truck pulled into the motel parking lot and stopped near the office entrance. Chapdelaine left the motor running, exited the vehicle, and entered the office. He was refused lodging. As the defendant turned to leave, Detective Shey accosted him, asked if he was George Chapdelaine, and, upon the defendant's answering affirmatively, placed him under arrest.

The defendant argues that there was no probable cause for his arrest because the information upon which the constabulary relied was stale (dated to January 1985), and because the informant's tip was unworthy of credence. In the latter regard, he urges particularly that the instability of the data source is made manifest by Harnois' prediction that he would be carrying an automatic weapon; such an augury was contradicted when no firearm was discovered at or after his arrest. Though Chapdelaine's assault upon the lawfulness of the arrest has been artfully mounted, he is firing blanks. His rodomontade is largely sound and fury, signifying little of consequence.

As the Court has recently emphasized, "[p]erhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a 'practical nontechnical conception.'" *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). In *Gates*, the Court explicitly linked its earlier observation regarding "particularized suspicion" to the probable cause standard:

'The process does deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'

*Gates*, 462 U.S. at 231–32, 103 S.Ct. at 2328–29, quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

Thus, "probable cause is a fluid concept—turning on the assessment of proba-

bilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 103 S.Ct. at 2329. *See also United States v. Curry*, 751 F.2d 442, 446 (1st Cir.1984). The Court's recent affirmation of the totality-of-the-circumstances test in *Gates* requires evaluation not of the isolated morsels upon which the defense so eagerly focuses, but of the full panoply of events leading up to Chapdelaine's apprehension.

■ First and foremost, Harnois clearly incriminated herself in the January 1985 drug transaction; that fact alone betokens and furthers her reliability. *See United States v. Harris*, 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723 (1971). And, although the evidence concerning the four-month-old cocaine haul may not have been entirely fresh, Harnois reported that the defendant had advised her that every time he sojourned to Florida, he went to buy cocaine. She quoted the defendant's son (currently) to the effect that Chapdelaine was at that very moment in Florida. The defendant's presence in Kinston, too, was of a piece with the scenario; the May pattern was sufficiently similar to the January agenda to generate suspicion. This evidence, when added to clues already in the possession of the police (*e.g.*, that someone was due to arrive in Rhode Island from Florida with a large quantity of cocaine, and that Chapdelaine had earlier attempted to bargain drug trafficking information in exchange for a lesser sentence for his son) strongly supported the inference that he was then embarked upon yet another drug deal.

■ Furthermore, the information which Harnois relayed to the officers was corroborated in several key particulars. Many of the persons mentioned to Harnois by the accused were known by the police to be involved in drug trafficking; Chapdelaine was, as Harnois had forewarned, travelling in a distinctive blue VW pickup truck; his route had taken him to Kinston, North Carolina; and he was having a bus converted into a customized mobile home. Like a swallow returning to Capistrano, he had made a beeline for the Cloverleaf. Corroboration of these details made the informant's tip highly reliable. *United States v. Butler*, 763 F.2d 11, 14 (1st Cir.1985). *See also Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (finding probable cause where police corroborate details of informant's advices). The pattern—movement of cocaine northward from Florida—was a significant one to trained DEA observers.[1] A tipster need not deliver an ironclad case to the authorities on the proverbial silver platter. It suffices if, viewed in the real-life context of ongoing events, the proffer is such that a prudent law enforcement officer would reasonably conclude that the likelihood existed that criminal activities were afoot, and that a particular suspect was probably engaged in them. Such was the case here.

■ The defendant further argues, however, that Harnois' reliability was destroyed, and probable cause thus undermined, when the police failed to discover a weapon when they searched the defendant immediately upon his arrest. But, when Chapdelaine departed the truck and entered the hotel (where, it should be remembered, he was well-known and frequently stayed), he had no reason to suspect that trouble was brewing. He certainly would not have jeopardized his good relations with the motel owner (an elderly lady) and/or his freedom to use the premises by toting a gun with him to register. Inasmuch as the police arrested the defendant in the course of a simple errand to secure his accommodations, they could still reasonably have believed that he did customarily carry a firearm and that it would be found somewhere in the truck. At least at this point in the sequence of events, the police

---

**1.** After all, in assessing the totality of the circumstances, "the expertise and experience of the law enforcement officers must also be taken into account." *United States v. McHugh*, 769 F.2d 860, 865 (1st Cir.1985) (citations omitted).

did not have adequate reason to doubt that Chapdelaine was armed.[2]

When the mise-en-scene is dispassionately viewed, it cannot be gainsaid but that Chapdelaine's arrest was amply supported by probable cause. The fragments of Harnois' account, together with the available corroboration, arranged themselves into a pattern highly suggestive of the suspect's participation in the narcotics trade, like iron filings organized within the field of a powerful magnet. Only if each piece is viewed in utter isolation from the others—a triage which Chapdelaine urges, but which *Gates* forbids—could a plausible doubt arise.

B. *The Search*

After Chapdelaine had been placed under arrest by Shey at the entrance to the motel lobby, he was led down the stairs and searched in the parking lot while positioned against his vehicle. Lincoln police officers conducted a once-over of the truck's interior and cargo bed, but turned up nothing. Sgt. Marcoux then escorted Chapdelaine to the Lincoln police station, while other officers secured the vehicle pending the arrival of members of the federal drug task force. As soon as the federal presence materialized, special deputy marshals Henry Roy and Daniel Silva searched the vehicle, finding a brown vinyl suitcase in the rear cargo area. Roy opened the luggage and examined it just closely enough to determine that it contained a large quantity of United States currency. Following the discovery, the vehicle and its contents were removed to the Lincoln police station.

At police headquarters, both the truck and the suitcase were more exhaustively searched. The suitcase was found to contain $6,000 and a small quantity of cocaine. Shortly after this find, a cavity search of the truck revealed two large plastic bags containing roughly three and one-half pounds of cocaine secreted within the rim of a spare tire.

The court need not tarry overlong anent the defendant's argument that the search and seizure of his vehicle were not incident to a lawful arrest.[3] The defendant's arrest, being based on probable cause, *see* text *ante* at Part I(A), was licit. And, while there may be some modest question as to whether the scope of these searches can be justified as incident to the arrest, *see generally Chimel v. California,* 395 U.S. 752, 763–66, 89 S.Ct. 2034, 2040–41, 23 L.Ed.2d 685 (1969), the key issue here is whether there was probable cause to search the vehicle itself.

■ As both parties correctly note, the "vehicle exception" to the warrant requirement was established in *Carroll v. United States,* 267 U.S. 132, 153–56, 45 S.Ct. 280, 285–86, 69 L.Ed. 543 (1925). This exception "applies only to searches of vehicles that are supported by probable cause," with the result that "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." *United States v. Ross,* 456 U.S. 798, 809, 102 S.Ct. 2157, 2164, 72 L.Ed.2d 572 (1982). And, if a warrantless search of the truck was permissible, the scope of the search need not be artificially circumscribed. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825, 102 S.Ct. at 2173.

---

**2.** Even if the police knew to a certainty that Harnois was mistaken in this single detail, that realization, standing alone, would not have automatically eradicated probable cause to believe that he was hip-deep in a cocaine transaction. The other indicia of reliability which attended the central parts of Harnois' story were too staunch to be so easily undercut. Though an informant's trustworthiness should be carefully assessed by a police officer, there is no requirement that the tipster be letter perfect in every particular. *Gates,* 462 U.S. at 233–35, 103 S.Ct.

at 2329–30. There is probable cause to believe that Larry Bird, who averages 89% from the line, will make his next foul shot; the fact that he misses it will not, in and of itself, alter either the reasonableness or the likelihood of the conclusion.

**3.** Indeed, Chapdelaine appears to have virtually conceded the point. Though his initial (prehearing) brief raised this banner aloft, his valedictory (post-hearing) brief eschewed it.

At the time the police arrested Chapdelaine, they had probable cause to believe that he was transporting cocaine from Florida and carrying an automatic weapon with him. In view of the fact that he exited his vehicle at the hostelry *with the motor running* and merely to ascertain if there were any vacancies for the night, the police had every reason to think that they would locate these items in the truck. It may be argued that once the police did not find an automatic weapon in either of their two preliminary searches, they no longer had probable cause to believe the defendant was carrying one. (If Chapdelaine was carrying the weapon to protect himself, as Harnois had forecast, he presumably would have kept it within reach.) On the other hand, it is not impossible, or even illogical, that the defendant, either on entering Rhode Island or when approaching the Cloverleaf, might have hidden the weapon, either because he felt it was no longer a necessary adjunct of his nearly-completed mission or to prevent its detection. More importantly, however, the fact that the police did not immediately unearth a submachine gun did not automatically destroy their belief that the defendant was laden with cocaine. (After all, much of what Harnois had predicted had been borne out.) Cocaine, perhaps unlike a weapon for self-defense, would need to be hidden very carefully. The small size and easy packageability of the substance made concealment a fairly simple matter. As the Supreme Court has recently emphasized, the scope of a warrantless search of an automobile "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Ross*, 456 U.S. at 824, 102 S.Ct. at 2172. A search for cocaine could logically take the officers into every nook and cranny of a vehicle, including the luggage.

The fact that the police also opened a separate container—the brown vinyl suitcase—does not further the defendant's cause. As the *Ross* court noted:

A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.... A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle must give way to the interest in the prompt and efficient completion of the task at hand.

*Ross*, 456 U.S. at 820–21, 102 S.Ct. at 2170–71. *See also United States v. Johns*, —— U.S. ——, 105 S.Ct. 881, 884–85, 83 L.Ed.2d 890 (1985).

The defendant contends, however, that even if there was probable cause, this warrantless prospecting did not fit within the circumstances justifying invocation of the vehicle exception. But, this contention does not withstand close scrutiny. The Court's decisions after *Carroll* have focussed on two reasons for the automobile exception. First, the car's mobility, *i.e.*, its capability to be quickly moved, may make it impossible to require strict observance of the procedural formalities of the fourth amendment. Secondly, the expectation of privacy stemming from a vehicle is materially less than that stemming from a private residence. *See generally California v. Carney*, —— U.S. ——, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1985); *South Dakota v. Opperman*, 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976); *Cardwell v. Lewis*, 417 U.S. 583, 588, 94 S.Ct. 2464, 2468, 41 L.Ed.2d 325 (1974); *Cady v. Donbrowski*, 413 U.S. 433, 442, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973); *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *Cooper v. California*, 386 U.S. 58, 59, 87 S.Ct. 788, 789, 17 L.Ed.2d 730 (1967).

In this instance, once Chapdelaine had been arrested and the police had secured his truck, the notion that the vehicle was in

danger of being moved and the evidence destroyed was clearly unfounded. But, law enforcement personnel who have probable cause to believe there is contraband in an automobile may nevertheless conduct a warrantless search, "even after [the vehicle] has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 3080, 73 L.Ed.2d 750 (1982) (per curiam). *See also Ross*, 456 U.S. at 807 & n. 9, 102 S.Ct. 2163 & n. 9; *Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1975) (per curiam); *Chambers*, 399 U.S. at 52, 90 S.Ct. at 1981; *McHugh*, at 864–867. "It is thus clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." *Thomas*, 458 U.S. at 261, 102 S.Ct. at 3080. In short, the lawful (warrantless) search of a vehicle is restricted neither temporally nor spatially.

Though his position sinks to the bottom in this sea of authorities, Chapdelaine grasps (feebly) at one final reed: he argues that because the Cloverleaf Motel was his frequent place of residence while he was in Rhode Island, it should be construed as his abode. Along this line, he urges the court to picture his pickup truck as if it were parked on his private property, and thus to accord it a greater expectation of privacy than would otherwise be the case. *See Coolidge v. New Hampshire*, 403 U.S. 443, 460–62, 91 S.Ct. 2022, 2034–35, 29 L.Ed.2d 564 (1971); *United States v. Bradshaw*, 490 F.2d 1097, 1103 (4th Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). Such a holding would, Chapdelaine suggests, get him home free.

Given the added vitality which the Court has lately breathed into the vehicle exception, *e.g.*, *California v. Carney, supra; United States v. Johns, supra*, the precedential value of *Coolidge* may itself be suspect. Yet, this court need not explore

that path for purposes of this case. Here, assuming arguendo that *Coolidge* is good law, the facts belie its applicability. While Chapdelaine was a frequent visitor to the Cloverleaf, he did not maintain a room there, nor ever stop over at prescribed times of the month or season. In this instance, he did not have a reservation; Chapdelaine had only just driven onto the property and had left the motor running while he went in search of lodging for the evening. In fact, his request for a room for the night was turned aside by the manager immediately before his arrest. There was no room at the inn. On this occasion, he was neither a guest of, nor a visitor at, the motel.

There is nothing to justify the defendant's professed belief that he had a greater expectation of privacy in this automobile than if he had been stopped on the highway, a minute or two earlier, before wheeling into the motel's parking lot. The accused's argument to the contrary pyramids possibility atop possibility, and strives to give a sense of stability to the merest of vellieties. The edifice which Chapdelaine tries to erect in the flickering shadow of *Coolidge* is a flimsy, jerry-built construct; it cannot survive even the mild breezes of cursory examination.

Thus, as there was probable cause to justify the search and seizure, this case fits squarely within the encincture of the automobile exception to the warrant requirement. The police conduct in this regard was not beyond the pale; indeed, it did not even wander close to the periphery.

### C. *The Custodial Interrogation*

Following his arrest, Chapdelaine was advised of his rights at police headquarters (by Sergeant Marcoux). The defendant requested that his attorney be summoned forthwith. But, he was not permitted to make the necessary telephone call at that moment. In the meantime, Agent McCarthy, accompanied by the United States Attorney (Lincoln Almond), went to the cellblock and asked the accused to sign a con-

sent to search his vehicle. McCarthy claims that he was not aware that the defendant had invoked his right to legal representation; Chapdelaine disputes this; Almond did not testify. The distinction is nugacious: "once a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect." *United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir.1983). *See also United States v. Downing,* 665 F.2d 404, 407 (1st Cir.1981). Whatever the state of McCarthy's or Almond's actual knowledge, they were charged with notice of the accused's statement to Marcoux. And, in any event, Chapdelaine did make his intentions plain when he declined their request, stating that he would never sign anything in the absence of his attorney.

Faced with the accused's refusal to sign the consent form, the federal officials determined that the search could go forward nonetheless. The truck and the suitcase were thereupon examined. *See* text *ante* at Part I(B). In the midst of the inspection, Chapdelaine asked to see McCarthy, who reappeared at his cell about four or five minutes later. According to Chapdelaine, he had decided to authorize the search; he "knew" that the officers would go through his truck and belongings anyway and figured there was no use wasting time by continuing to withhold his cooperation. (Unbeknownst to Chapdelaine, the cocaine cache had already been uncovered.) The defendant then allegedly made certain statements and was informed by McCarthy that the hidey-hole in the tire rim had theretofore been found.

Agent McCarthy then proceeded to pose a number of questions about other people to the defendant. What Chapdelaine later termed a "friendly discussion" then ensued. That colloquy was followed by a case-specific interrogation, in which McCarthy asked Chapdelaine a number of potentially incriminating questions, all of which

the defendant claims he denied. At no point during this tete-a-tete did McCarthy give the defendant his *Miranda* warnings or otherwise advise him of his rights.[4]

The government has stressed, with considerable fanfare, the fact that the defendant had been given his *Miranda* warnings by Marcoux early on, and thus knew that he had a right not to talk with McCarthy. But, *Miranda* requires not only that a defendant be *informed* of his rights, but that the police behave in a manner consistent with those rights. Thus, a defendant who is abstractly aware of his *Miranda* rights (and with the popularity of police shows on television, there are few persons who are not familiar with the litany) must also be assured that they will be respected in his situation. In this instance, after the arrestee had plainly and unequivocally invoked his right to an attorney to one law enforcement officer, and after he had at least insinuated to another pair that he preferred to await his lawyer's arrival, McCarthy resumed the interrogation in the absence of counsel and without making even a cursory attempt to discover whether the defendant had reconsidered and elected to waive his rights. Though the accused's background and experience are germane to the question of waiver, *see Fuentes v. Moran,* 733 F.2d 176, 181 (1st Cir.1984), the government cannot rely on such intangibles alone. Even if this defendant was wise in the ways of the stationhouse, or was attempting to bargain with the police, his savvy cannot substitute for the employment of proper police procedures and/or the strict observance of his constitutional rights.

As the Supreme Court has recently indicated, while the accused may himself validly waive his rights and respond to interrogation, additional safeguards are necessary when a request for counsel is on the table. *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981). "[W]hen an accused has invoked his right

---

**4.** Agent McCarthy did testify that, after he had left the cellblock on this occasion, he returned and belatedly advised Chapdelaine of his *Mi-*

*randa* rights. Even if this testimony is credited, it was plainly too little, too late. The horse had long since cantered out of the barn.

to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id. See also Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983).

Based upon the testimony adduced at the hearing, it is extremely difficult to discern whether the resumption of the interrogation was a brainstorm of the police, or whether it flowed naturally from the defendant's self-initiated conversation with McCarthy. *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85. At bottom, such fine nuances matter little in this case. Even if, as the government would have it, McCarthy's interrogation came about in consequence of Chapdelaine's invitation,[5] the prosecution has not convincingly refuted Chapdelaine's claim that he requested an attorney, nor has it offered any substantial evidence whatsoever to indicate that, as *Edwards* demands in such circumstances, he knowingly and intelligently abandoned his right to counsel and his right to silence. *See Edwards*, 451 U.S. at 485–86 & n. 9, 101 S.Ct. at 1885 & n. 9. The failure is critical. As the Supreme Court cautioned recently, "even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Bradshaw*, 462 U.S. at 1044, 103 S.Ct. at 2834.

The government's sole offering in this direction is the claim that Chapdelaine asked to see McCarthy. *But see* n. 5, *ante*. Assuming this is true, it does not indicate that the defendant actually intended to re-nounce the rights which he had earlier unhesitatingly claimed. Chapdelaine's avowal that he sought to see McCarthy only for the limited purpose of executing the consent-to-search form stands unrebutted on this record. The court must also note that the circumstances of this case do not readily suggest a waiver. This defendant was arrested at gunpoint and taken to the police station. There, he was confronted by a veritable array of officers from several different law enforcement agencies, accompanied by the United States Attorney. Despite his requests to be allowed to call his attorney, he was not permitted to do so until his arraignment the following day. Under the circumstances, any withdrawal of the defendant's original insistence that his attorney be present should not lightly be inferred. The custodial interrogation conducted by McCarthy, who failed either to remind the defendant of his rights or to discover whether a change in position was being knowingly and intelligently advanced, violated the defendant's fifth amendment rights under *Edwards*.

■ The burden of proving that a waiver of the right to counsel was effected "is on the government and is a heavy one." *United States v. Montgomery*, 714 F.2d 201, 203 (1st Cir.1983). In this case, the prosecution has fallen measurably short of establishing that the defendant, under his own steam, "evinced a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045–46, 103 S.Ct. at 2835. The claim of waiver is untenable. Accordingly, the defendant's statements made in response to McCarthy's questioning must be suppressed.[6] But, inasmuch as the fruits of the search were fully harvested before the statements were made, this holding does not inhibit the government's right to use

---

**5.** It is not without significance that the government never produced the police officer to whom Chapdelaine reportedly announced his turnabout desire to speak with McCarthy (and who then called McCarthy to the cellblock). In point of fact, that officer's identity was never made known at the hearing.

**6.** The defendant has also challenged these statements as stemming from the original, illegal arrest and urged their suppression under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This argument is baseless: there was no unlawful arrest here. *See* text *ante* at Part I(A).

the seized items as evidence in Chapdelaine's trial. The prosecution did not gain that evidence through any exploitation of the fifth amendment violation which produced the accused's admissions.

## II.

The motion to suppress is granted as to the inculpatory admissions allegedly made by the accused to Agent McCarthy while he was in custody in the holding cell at the Lincoln police station. In all other respects, the motion to suppress is denied.

*It is so ordered.*