USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1536

 UNITED STATES,

 Appellee, 

 v.

 RODERICK L. TAYLOR,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Michael A. Ponsor, U.S. District Judge]
 

 Before

 Selya, Circuit Judge,
 
Coffin and Campbell, Senior Circuit Judges. 
 
 

 John M. Thompson for appellant.
 Ariane D. Vuono, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney and Dina Michael Chaitowitzwere on brief for appellee.

December 4, 1998

 
 

 Campbell, Senior Circuit Judge. Taylor appeals from his
conviction on one count of possession with intent to distribute
cocaine pursuant to 21 U.S.C. 841 and one count of using or
carrying a firearm during and in relation to a drug trafficking
crime pursuant to 18 U.S.C. 924(c). Prior to trial, Taylor filed
a motion to suppress drugs and firearms seized from the car he was
driving on the ground that the initial stop of the car was not
justified. The district court denied the motion. On appeal,
Taylor challenges the denial of the motion to suppress. He also
contends that the jury instructions pertaining to the firearms
offense were erroneous. We affirm.
 I. 
 On February 1, 1996, at approximately 1:00 p.m., Officer
Kevin Lee of the Springfield Police Department, while working his
shift in the Narcotics Division, received a telephone call from a
confidential informant. During the course of their conversation,
which lasted approximately five minutes, the informant told Officer
Lee that he had observed a brown Acura with tinted windows and
Massachusetts registration number 977-YMS in the area of Cambridge
Street in Springfield. The informant stated that the Acura was
occupied by two black males, one approximately six feet seven
inches tall and wearing a Dallas Cowboys jacket and the other
approximately six feet tall with braided hair and wearing a black
leather jacket. The informant also told Officer Lee that he had
observed the two men in possession of a large quantity of crack
cocaine and two nine millimeter handguns. He informed Officer Lee
that the men were making "drops" (delivering narcotics to street-
level dealers) in the Mason Square area of Springfield. 
 During the hearing on Taylor's motion to suppress,
Officer Lee testified that it was standard procedure in the
Narcotics Division of the Springfield Police Department to assign
each informant to an individual officer for handling. This was
done, according to Lee, in part to ensure that the identities of
confidential informants remained secret. The informant who called
Officer Lee on February 1, 1996 was assigned to Officer Talbot,
another officer in the Narcotics Division who was not on duty that
day. Although the informant was assigned to Officer Talbot,
Officer Lee testified that he had worked personally with the
informant for approximately one year prior to receiving the
telephone call. He testified that he knew the informant by name
and recognized his voice immediately. Officer Lee testified that
he had worked with the informant on approximately five occasions
prior to February 1, 1996. Officer Lee recalled that he had
participated in "raids" and "lookouts" based upon information
provided by the informant and that the informant had participated
in controlled purchases of narcotics on behalf of the police. 
Officer Lee could not recall whether the information provided by
the informant on these five prior occasions had led to any arrests
or convictions. At the time he received the call, Officer Lee was
aware, however, that on at least five occasions in the past the
informant had provided Officer Talbot with information that led to
arrests and convictions. Based upon his own experience and upon
his knowledge of Officer Talbot's experience with the informant, 
Officer Lee characterized the informant as "one of the better
informants that we have."
 Immediately after his conversation with the informant,
Officer Lee made a general radio broadcast to all Springfield
police units. He told all units to be "on the lookout" for a brown
Acura with tinted windows bearing Massachusetts registration number
977-YMS, last seen on Cambridge Street in Springfield. Officer Lee
conveyed the description of the two occupants of the car that had
been provided by the informant. He also alerted all units that the
occupants of the Acura had two nine millimeter handguns and a large
quantity of crack cocaine. 
 Approximately 45 minutes after Officer Lee's broadcast,
Officer Komosa, a twenty-nine-year veteran of the Springfield
Police Department who was on patrol in his marked police cruiser,
saw a gold Acura parked at the curb in front of a variety store
near the corner of State Street and Cortland Street. This location
is in the Mason Square area of Springfield. Officer Komosa drove
past the Acura and called the station to confirm the registration
number. The car bore the same plate number as that broadcast by
Officer Lee. Officer Komosa testified at the suppression hearing
that he recalled Officer Lee's radio broadcast mentioning that
this car was involved in the sale of narcotics and that the
occupants were believed to have weapons. Officer Komosa further
testified that when he first observed the Acura there appeared to
be someone in the car and that, as he passed the car, it looked
like there were people coming towards it from the store, and
perhaps entering it. 
 After he received confirmation of the plate number,
Officer Komosa requested backup from other officers in the area. 
The Acura pulled from the curb and began heading east on State
Street. When the Acura reached a stop light at the corner of State
Street and Benton Street (a location that is also in the Mason
Square area of Springfield), Officer Komosa positioned his cruiser
behind the Acura and activated his overhead lights. Officer Komosa
instructed officers in two other police cruisers, which arrived at
the intersection within seconds of Officer Komosa's request for
backup, to converge on and block in the Acura. When the Acura was
blocked in, Officer Komosa got out of his cruiser. He testified at
the suppression hearing that he drew his weapon "knowing that
there's guns involved in this particular thing." Officer Komosa
commanded the driver of the Acura (later revealed to be Taylor) to
shut off the car's engine. Using his door as cover, Officer Komosa
waited as other officers approached the Acura. Officer Komosa
could see through a small, un-tinted portion of the back window
that there were two individuals in the front seat and at least one
individual in the back seat of the Acura. Because of the Acura's
tinted windows, however, Officer Komosa could not positively match
any of the car's occupants with the description provided by the
informant, nor could he see what any of the individuals were doing
inside the car.
 Two officers in plain clothes, at least one of whom had
his gun drawn, then approached the driver's side of the Acura. At
the same time, other officers also approached the passenger's side
of the Acura. As Officer Komosa watched, three occupants were
removed from the Acura, placed on the ground, and pat-frisked for 
 weapons. Once the occupants were secured by the other officers,
Officer Komosa re-holstered his weapon. Officer Komosa testified
that the occupants were on the ground for no longer than three to
four minutes. Once they were frisked, the occupants of the car
were taken toward the rear of the Acura and interviewed. At that
point, none of the officers had their weapons drawn. The occupants
were not placed in handcuffs and the record does not indicate that
they were told at the time by any officer that they were not free
to leave. Officer Komosa testified that in all, a total of ten to
twelve officers, some in plain clothes and others in uniform, and
a number of cruisers and unmarked vehicles ultimately responded to
his request for backup. He testified that twenty-five to thirty
minutes elapsed from the time he stopped the car to the time the
occupants were placed under arrest and taken to the police station. 
 Officer Auger and Sergeant Kennedy arrived on the scene
in separate vehicles approximately one minute after receiving
Officer Komosa's request for backup. Officer Auger testified that
there were between three and seven officers on the scene when he
arrived. Upon his arrival, Officer Auger observed that the front
passenger door of the Acura was open, and that all three
individuals were outside the car and were being interviewed by
officers near the rear of the Acura. Officer Auger went to the
passenger side of the Acura and, after positioning his head and
upper torso inside the passenger compartment, immediately detected
a "strong odor" of marijuana. Officer Auger testified at the
suppression hearing that he recalled that Officer Lee's broadcast
had mentioned weapons, and that he was searching the passenger's
side floor area for weapons. He testified that immediately after
he looked at the floor area, he looked up into the area between the
Acura's sunroof and its retractable sunscreen and observed a large,
clear plastic bag containing seeds, stems and marijuana. Officer 
Auger retrieved these items. Officer Auger also retrieved from the
sunroof compartment two more plastic bags containing crack cocaine
(225 grams) packaged for street sale. 
 At the same time that Officer Auger was searching the
passenger side of the Acura, Sergeant Kennedy was searching the
driver's side for weapons that might have been accessible to the
occupants of the Acura. When Sergeant Kennedy opened the driver's
side door and entered the Acura, he too immediately identified a
"strong smell of marijuana." Two to three minutes after they began
searching the car for weapons, Sergeant Kennedy saw Officer Auger
retrieve a large bag containing marijuana from the sunroof area. 
Sergeant Kennedy then looked into the driver's side area of the
sunroof compartment and found a ski cap wrapped around a loaded .45
caliber automatic pistol with an extra ammunition clip. Sergeant
Kennedy retrieved these items from the car. The occupants of the
car were then arrested, placed in a police cruiser, and transported
to the police station.
 Taylor and a co-defendant were indicted in federal court
on one count of possessing with intent to distribute cocaine base,
in violation of 18 U.S.C. 841 and 2, and one count of using and
carrying a firearm during and in relation to a drug trafficking
crime, in violation of 18 U.S.C. 924(c)(1). Taylor filed a
motion to suppress the marijuana, crack cocaine, loaded .45 caliber
handgun and ammunition seized from the sunroof area of the Acura. 
The district court denied the motion to suppress. The court held
that the initial stop of the Acura was justified under Terry v.
Ohio, 392 U.S. 1 (1968), and that once the officers detected a
"strong odor" of marijuana, the search of the sunroof was supported
by probable cause. After a four-day jury trial, Taylor was found
guilty on both counts of the indictment. He was sentenced to 120
months' imprisonment on Count One and 60 months' imprisonment on
Count Two, to be served consecutively. 
 II. DISCUSSION
A. The Motion to Suppress
 Taylor challenges the denial of his motion to suppress
the evidence seized from the Acura. In assessing this claim, we
review the district court's findings of fact for clear error, but
we review de novo its conclusions of law and its ultimate ruling on
the constitutionality of the government's conduct. See United
States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998). 
 In Terry v. Ohio, the Supreme Court recognized that the
police must be free to pursue what it termed a "legitimate
investigative function." 392 U.S. at 21. Hence "a police officer
may in appropriate circumstances and in an appropriate manner
approach a person for purposes of investigating possibly criminal
behavior even though there is no probable cause to make an
arrest." Id. The Terry Court went on to hold that, in
furtherance of such a legitimate investigation, the police may take
reasonable steps to protect themselves by searching a suspect for
weapons or taking other protective measures. Id. at 23-24. In
doing so, "[t]he officer need not be absolutely certain that the
individual is armed; the issue is whether a reasonably prudent man
in the circumstances would be warranted in the belief that his
safety or the safety of others was in danger." Id. at 27. In
subsequent cases, the Supreme Court has held that the police's
investigatory powers include stopping motor vehicles upon
reasonable suspicion; and that, when doing so, officers may take
reasonable measures for their own safety, such as by disarming the
suspect. See, e.g., Michigan v. Long, 463 U.S. 1032, 1049
(1983)(noting that "roadside encounters between police and suspects
are especially hazardous, and that danger may arise from the
possible presence of weapons in the area surrounding a suspect"). 
 Under the now familiar two-pronged inquiry, we must
determine "whether the officer's action was justified at its
inception, and whether the action taken was reasonably related in
scope to the circumstances which justified the interference in the
first place." Terry, 392 U.S. at 20. To satisfy the first prong,
"'the police officer must be able to point to specific and
articulable facts which, taken together with rational inferences
from those facts, reasonably warrant that intrusion.'" United
States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994) (quoting Terry, 392
U.S. at 21). To satisfy the second prong, we examine the totality
of the circumstances, see United States v. Cruz, 156 F.3d 22, 26
(1st Cir. 1998), bearing in mind that "it would be unreasonable to
require that police officers take unnecessary risks in the
performance of their duties," Terry, 392 U.S. at 23. 
 The initial stop in this case was based upon information
provided by a confidential informant. The district court found
that the informant was reliable. We see no basis for rejecting
that conclusion. Indeed, the court's finding is amply supported by
the record. The informant had provided reliable information to the
Springfield Police Department on several occasions in the past. 
Officer Lee was personally familiar with the informant. He
recognized the informant's voice and knew him by name. At the time
he received the telephone tip, Officer Lee was aware that the
informant had provided reliable information to Officer Talbot and
perhaps other officers that had led to several arrests and
convictions. Officer Lee himself had worked closely with the
informant on several occasions during the year preceding the
telephone tip, participating with him in "raids," "lookouts," and
controlled purchases. While Officer Lee could not recall whether
arrests or convictions had followed these events, he believed the
informant to be a reliable source of information. Indeed, Officer
Lee testified that the informant was "one of the better informants
that we have."
 The Supreme Court has upheld Terry stops based upon
information provided by informants, both known and unknown to the
police. In Adams v. Williams, 407 U.S. 143 (1972), a person known
to an officer approached the officer and informed him that an
individual seated in a nearby vehicle was carrying narcotics and
had a gun at his waist. The officer approached the car, tapped on
the window, and asked Williams to open the door. When Williams
instead rolled down the window, the officer reached into the car
and removed a loaded revolver from Williams' waistband. The gun
had not been visible to the officer from outside the car, but it
was located in precisely the place indicated by the informant. 
Williams was arrested for unlawful possession of the revolver. A
subsequent search of the car revealed a large quantity of heroin. 
The Supreme Court held that the officer had acted justifiably in
responding to the informant's unverified tip. The Court emphasized
that the informant was known personally to the officer and "had
provided him with information in the past." Id. at 146. The
Court noted that informants' tips may vary greatly in their value
and reliability, but went on to state that "when a credible
informant warns of a specific impending crime . . . the subtleties
of the hearsay rule should not thwart an appropriate police
response." Id. at 147. 
 In Alabama v. White, 496 U.S. 325 (1990), the Court
upheld a Terry stop of an automobile based upon an anonymoustelephone tip. In White, the informant told police that an
individual would be leaving a particular address at a particular
time in a brown Plymouth station wagon with a broken right
taillight. The informant further informed police that the
individual would be traveling to Dobey's Motel, and that she would
be in possession of an ounce of cocaine, which she would carry
inside a brown attache case. Officers proceeded to the specified
address, where they observed a brown Plymouth station wagon with a
broken right taillight. The officers saw someone leave the
building, carrying nothing in her hands, and enter the station
wagon. They followed the car as it drove the most direct route to
Dobey's Motel and stopped the car just before it reached the motel. 
A consensual search of the car revealed drugs. The Supreme Court
held that the officers possessed reasonable suspicion to stop the
car. The Court emphasized that "reasonable suspicion can arise
from information that is less reliable than that required to show
probable cause." Id. at 330. The Court noted that the officers
corroborated the information provided by the tipster relating to
the make of the car, the time the person would be leaving the
building, and the person's destination. Id. at 331. Although not
every detail mentioned by the informant was verified, the Court
held that the anonymous tip had been sufficiently corroborated to
furnish a reasonable suspicion of criminal activity.
 Like Adams, this case involves a tip from a known
informant, one who had provided reliable information to the police
in the past. In Adams, the informant was not able to provide many
details, while here the informant furnished specifics as to the
make and color of the car, its registration number, a description
of the occupants, and the neighborhood where they were making the
drug drops. Although unable to see the occupants, Officer Komosa
was able to confirm the other details before he stopped the Acura. 
Thus, as in White, there were aspects of the informant's tip that
could be verified before the stop was actually made. 
 The Supreme Court has "looked favorably upon a practical,
commonsense approach to the issue of reasonable suspicion." United
States v. Sowers, 136 F.3d 24, 28 (1st Cir.), cert. denied, 119 S.
Ct. 105 (1998). As the Supreme Court has said:
 The Fourth Amendment does not require a
 policeman who lacks the precise level of
 information necessary for probable cause to
 arrest simply to shrug his shoulders and allow
 a crime to occur or a criminal to escape. On
 the contrary, Terry recognizes that it may be
 the essence of good police work to adopt an
 intermediate response.

Adams v. Williams, 407 U.S. 143, 145 (1972). Here, the police were
acting on a tip from a known reliable informant that the occupants
of the Acura were making "drops" of narcotics in a particular area,
and were in possession of weapons. "'A tipster need not deliver an
ironclad case to the authorities on the proverbial silver platter. 
It suffices if . . . a prudent law enforcement officer would
reasonably conclude that the likelihood existed that criminal
activities were afoot, and that a particular suspect was probably
engaged in them.'" United States v. Diallo, 29 F.3d 23, 26 (1st
Cir. 1994) (quoting United States v. Chapdelaine, 616 F. Supp. 522,
526 (D. R. I. 1985), aff'd 795 F.2d 75 (1st Cir. 1986)). The
Supreme Court in White credited the proposition that "because an
informant is shown to be right about some things, he is probably
right about other facts that he has alleged, including the claim
that the object of the tip is engaged in criminal activity." 496
U.S. at 331 (citing Illinois v. Gates, 462 U.S. 213, 244 (1983)). 
Doing the same here, we conclude that under the totality of the
circumstances the tip from a known, reliable informant, which was
corroborated in significant aspects by Officer Komosa, exhibited
sufficient indicia of reliability to justify the investigatory stop
of Taylor's car. See United States v. Alston, 112 F.3d 32, 34 (1st
Cir.) (upholding Terry stop based upon corroborated tip from
confidential informant who had provided reliable information in the
past that individual wearing certain clothing and located at
certain address was carrying a gun), cert. denied, 118 S. Ct. 568
(1997). 
 Determining that the stop was justified at the outset,
while essential, is only the first step. We must also ascertain
"whether the action taken was reasonably related in scope to the
circumstances which justified the interference in the first place." 
Terry, 392 U.S. at 20. We have little trouble in concluding that
the officers acted reasonably under the circumstances in this case. 
 Based upon Officer Lee's broadcast, Officer Komosa and
the other officers who responded to his request for backup had
reason to believe that the occupants of the Acura were armed drug
dealers engaged, at that very time, in dropping off drugs. 
Possessed of such information, Officer Komosa, a twenty-nine-year
veteran of the Springfield Police Department, was justified when
approaching the suspects' car in drawing his weapon and ordering
the driver to shut off the car's engine. Once the Acura was
immobile, the officers properly removed the occupants and secured
them so as to conduct a limited search of their persons for
weapons. After the frisking, which lasted three or four minutes,
the suspects were taken to the rear of the car where they were
interviewed. Weapons were re-holstered by then and no handcuffs
used. An officer is permitted to conduct a "reasonable search for
weapons for the protection of the police officer, where he has
reason to believe that he is dealing with an armed and dangerous
individual, regardless of whether he has probable cause to arrest
the individual for a crime." Terry, 392 U.S. at 27. As the TerryCourt noted, "it would appear to be clearly unreasonable to deny
the officer the power to take necessary measures to determine
whether the person is in fact carrying a weapon and to neutralize
the threat of physical harm." Id. at 24. The district court
supportably found that "[a] more casual approach, given the
information [the officers] had, would have been unprofessional and
perhaps even foolhardy." 
 Directly after the pat-down search of Taylor, Officer
Auger and Sergeant Kennedy arrived on the scene and looked in the
car. They testified that they did so in order to search for any
immediately available weapons. Where officers reasonably believe
that a suspect is dangerous, they may search those areas of the car
in which a weapon may be placed or hidden. See Long, 463 U.S. at
1049. Thus, the officers were permitted to conduct a search of
the passenger compartment of the automobile for any weapons that
might have been accessible to the occupants. This limited search
of the vehicle for weapons was permitted even though the occupants
had been secured and taken to the rear of the Acura. See id. at
1051-52 (holding that officers who searched passenger compartment
of stopped car for weapons acted reasonably even though suspect was
under officers' control at time of search). When looking in,
Officer Auger and Sergeant Kennedy immediately detected a "strong
odor" of marijuana. That observation provided probable cause for
a search of the car for any narcotics. See United States v.
Staula, 80 F.3d 596, 602 (1st Cir.) ("The case law is consentient
that when a law enforcement officer detects the odor of marijuana
emanating from a confined area, such as the passenger compartment
of a motor vehicle, that olfactory evidence furnishes the officer
with probable cause to conduct a search of the confined area."),
cert. denied, 117 S. Ct. 156 (1996). In conducting their search
based upon probable cause, the officers noticed in plain view in
the sunroof compartment a bag containing marijuana and a .45
caliber weapon wrapped in a ski cap. Those items were properly
seized. 
 Taylor argues, to the contrary, that what occurred when
Officer Komosa stopped the Acura was a de facto arrest, requiring
at the outset not just reasonable suspicion but probable cause,
which he further declares was lacking. Taylor points to the
following facts: (1) Officer Komosa and at least one other officer
had their weapons drawn; (2) there were ten to twelve officers on
the scene; (3) Taylor and the other occupants of the Acura were
placed face-down on the ground and pat-frisked; (4) the egress of
the Acura was blocked by police cruisers; and (5) the detention
lasted approximately thirty minutes. 
 "There is no scientifically precise formula that enables
courts to distinguish between investigatory stops, which can be
justified by reasonable suspicion, and other detentions that the
law deems sufficiently coercive to require probable cause 
detentions that are sometimes called 'de facto arrests.'" United
States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). For the
reasons discussed, we believe that the actions of Officer Komosa
and the other officers, when viewed in the totality of
circumstances then confronting them, fit within the contours of a
permissible Terry stop. 
 It is true that Officer Komosa and another officer drew
their weapons when approaching the Acura after the stop was made. 
Two cruisers arriving on the scene blocked Taylor's vehicle. And
thereafter the Acura's occupants were secured on the ground and
searched for weapons. However, as said, the information in Officer
Lee's broadcast concerning the presence of weapons and the illegal
nature of the suspects' ongoing activities warranted Officer Komosa
and his fellows in believing that the Acura's occupants were
potentially very dangerous. Officer Komosa and the others were
entitled "to take swift measures to discover the true facts and
neutralize the threat of harm if it materialized." Terry, 392 U.S.
at 30. See United States v. Trullo, 809 F.2d 108, 113 (1st Cir.)
(holding that police officer's use of drawn weapon did not convert
investigative stop into arrest), cert. denied, 482 U.S. 916 (1987). 
 We have previously held that nearly identical
circumstances did not convert an otherwise justified investigatory
stop into a de facto arrest requiring probable cause. As we said
in United States v. Jackson, 918 F.2d 236 (1st Cir. 1990):
 These police actions blocking the Jackson
 vehicle and frisking Edwards did not
 transcend an investigatory stop. The police
 may conduct an investigatory stop by blocking
 the egress of a vehicle in which the criminal
 suspect is riding, and may approach the
 vehicle with weapons at the ready on a
 reasonable suspicion that its occupants are
 armed.

Id. at 238 (citations omitted). See also United States v. Quinn,
815 F.2d 153, 156-58 (1st Cir. 1987) (holding that no de factoarrest occurred where police cruisers blocked suspect's egress,
five officers were present, and interrogation took 20-25 minutes). 
 Nor is there any indication that Taylor was detained for
any longer period of time than was necessary to allow the officers
to perform a careful check to satisfy themselves that there was no
danger from accessible weapons and to "confirm or dispel their
suspicions quickly." United States v. Sharpe, 470 U.S. 675, 682
(1985). This is not a case in which a significant period of time
elapsed between the initial stop of the car and the discovery of
contraband. Cf. Sowers, 136 F.3d at 28 ("Even though at least
thirty minutes elapsed between the time of the stop and the
discovery of what appeared to be contraband, we see no basis for
disrupting the district court's founded conclusion that no de facto
arrest transpired."). Within only a few minutes of the stop of the
Acura, officers approaching the car smelled marijuana, providing
them with probable cause to search the interior of the vehicle. 
Thereafter, the officers were justified in detaining the occupants
of the Acura in order to inventory the contraband, conduct any
further interrogation of the occupants, and place them under
arrest. 
 Under these circumstances, we cannot say that the
district court erred in concluding that a reasonable person,
standing in Taylor's shoes, would have understood, at the time,
that he was being briefly detained for inquiry and investigation,
not arrested. See Berkemer v. McCarty, 468 U.S. 420 (1984). 
Several aspects of the initial stop support the court's conclusion. 
First, at no time prior to the discovery of drugs and weapons was
Taylor placed in handcuffs. Second, there is no evidence in the
record that Taylor was treated harshly by the officers or
physically handled beyond the limited pat-frisk officers conducted
immediately after Taylor was removed from the car. Third, none of
the officers communicated to Taylor that he was under arrest or
that they wished to place him under arrest until after the
contraband was seized. Fourth, at no time prior to the discovery
of the cocaine, weapon, and ammunition was Taylor told that he was
not free to leave. Fifth, all of the officers re-holstered their
weapons immediately after the occupants of the Acura were taken
from the car and secured. Finally, all of the events including
the search of the car and the interrogation of its occupants took
place on a public street. 
 The totality of the circumstances demonstrates that a
valid Terry stop occurred. The district court did not err in
denying Taylor's motion to suppress the evidence seized from the
Acura. 
B. The Section 924(c)(1) Instruction
 Taylor also argues that the court's instructions to the
jury with respect to the elements necessary to convict him for
"carrying or use" of a firearm under 18 U.S.C. 924(c)(1) were
erroneous. Taylor contends that the court's instructions were 
flawed because they authorized the jury to convict him based solely
upon a finding that he "used" a firearm, and that the evidence was
insufficient for the jury to find that Taylor "used" a firearm
during and in relation to a drug trafficking crime. As Taylor did
not object to the challenged instruction at trial, we review the
court's instruction for plain error. See United States v. Booth,
111 F.3d 1, 2 (1st Cir.), cert. denied, 118 S. Ct. 204 (1997). 
"This standard requires not only that the error be plain . . . but
also that affirmance would result in a 'miscarriage of justice,'
one that would jeopardize public confidence in the integrity of the
judicial process." United States v. Ramirez-Ferrer, 82 F.3d 1149,
1152 (1st Cir.), cert. denied, 117 S. Ct. 405 (1996). The Supreme
Court has said that plain error requires that "the error must have
been prejudicial: It must have affected the outcome of the
district court proceedings." United States v. Olano, 507 U.S. 725,
734 (1993). 
 The court's instructions indicated that two possible
bases for conviction were presented to the jury. The first was
"use" of a firearm, which, as the court accurately instructed,
required "active employment of the firearm." The second was 
"carrying" of a firearm, which the jury was only told required
"more than mere momentar[]y possession" of the firearm. 
 It is questionable whether the evidence here supported a
"use" finding, since the defendant was not shown to have actively
deployed a firearm. See Bailey v. United States, 516 U.S. 137, 144
(1995). The evidence, however, fully supported a "carrying"
finding. See Muscarello v. United States, 118 S. Ct. 1911, 1914
(1998) (phrase "carries a firearm" applies to person who knowingly
possesses and conveys firearms in a vehicle). The undisputed
evidence established that officers found a loaded .45 caliber
weapon and 225 grams of cocaine just above Taylor's head in the
Acura he was driving when Officer Komosa stopped the car. That
evidence provided ample basis from which the jury could reasonably
conclude that Taylor "carried" a firearm "in relation to" a drug-
trafficking crime. See id. at 1919 (holding that person who
carries drugs and weapons in trunk of vehicle or carries a firearm
in locked glove compartment of vehicle while transporting drugs
"carries a firearm" within meaning of section 924(c)(1)). 
 To be sure, the "carrying" instruction was less than
illuminating. But it is unclear how the reference to "possession"
harmed the defendant, and we cannot see that the absence,
otherwise, of a definition of "carrying" constituted plain error
resulting in a "miscarriage of justice." See United States v.
Young, 470 U.S. 1, 15 (1985) (plain errors "'seriously affect the
fairness, integrity or public reputation of judicial proceedings'")
(quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). At
worst, the jury was left to wrestle with the meaning of "carrying"
in a situation where all the evidence indicated that a firearm was
being carried in relation to a drug crime. On the facts, it was
most unlikely that any deficiency in the instructions "affected the
outcome of the district court proceedings." Olano, 507 U.S. at 734. 
 Affirmed.